**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SCOTT D. MICHALESKO,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:13-2634** |
| **v.** | : | **(MANNION, D.J.)** |
| **FREELAND BOROUGH, *et al.,*** | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Scott D. Michalesko spent nearly twelve years as an officer with the Freeland Borough police department. During the last year of his service, he broke both elbows, one wrist, also sustaining injuries to his ribs and face while apprehending a criminal. He recovered for four months before he was cleared by his doctor to return to limited duty. One week after being cleared by his doctor, he was notified that borough officials were conducting an investigation into whether some of his actions warranted suspension. The next day, December 22, 2011, a friend of the family called police and told them that Mr. Michalesko held a gun to his head and threatened to commit suicide. After his daughter was able to calm him down and the gun was taken away, she took him to the hospital before the Pennsylvania State Police arrived. Mr. Michalesko voluntarily checked himself into the hospital to receive mental treatment, but only remained there for a few hours.

After becoming aware of the situation, the Freeland Borough's chief of police sent a letter to the borough council to notify them of the situation and

request council to relieve Mr. Michalesko of his duties for the time being. Approximately two weeks later, the Freeland Borough council voted to temporarily suspend plaintiff without pay. A hearing was conducted roughly a month later where the council received evidence from both the Borough solicitor and Mr. Michalesko. At a later meeting, council voted to terminate the plaintiff for actions unbecoming an officer. That decision was later overturned by an arbitration panel. The plaintiff is now pursuing alleged violations of his constitutional rights and rights under the ADA and PHRA.

The court finds the plaintiff has stated valid due process and first amendment claims against the Borough at this stage of the proceedings. However, the individual members of the council are entitled to qualified immunity as to the due process claim, but not as to the first amendment claim. Further, the court finds the plaintiff has failed to state a claim under both the ADA and the PHRA. As such, those claims are dismissed.

## I.    FACTUAL BACKGROUND

The plaintiff, Scott D. Michalesko was a police officer for the Freeland Borough police department for approximately twelve years. He was also a member of the Fraternal Order of Police Officers Union and acted as the Bargaining Committee Chairman for his police department. In August 2011 he suffered various injuries, including two broken elbows, a broken wrist, bruised ribs, and a facial injury, while making an arrest. The day after he was

2

injured he requested and was granted Heart and Lung benefits based on his physical ailments. (Doc. 6, p. 4). The plaintiff was unable to work from the date of his injury through early December.

In early September he informed the Freeland Borough council that the union intended to proceed with binding interest arbitration[1]. Starting in early December, the plaintiff alleges that the defendants who were members of the Freeland Borough council during this period, Robert Quinn, John Budda, John Potoskie, Rick Wenner, Barbara Tulanowski, Joseph Palko, Jr., and Daniel Bobby (hereinafter referred to collectively as the "the council members"), all engaged in a campaign of harassment against him. He claims they disparaged him by claiming he was able to return to work, pressured him to return to work without full medical clearance, made false accusations of criminal wrongdoing against him, suspended him without pay, and terminated him in February, 2012. (Doc. 6, p. 7).

The plaintiff avers that on December 6, 2011, the defendants determined he was ready to return to work and, as such, "they were going to terminate his Heart and Lung benefits." Approximately one week later, the plaintiff's doctor cleared him to return to work in a limited capacity. There is no allegation that the defendant's actually terminated those benefits prior to him being cleared to return to work the next week. The doctor went on to state

---

[1]Interest arbitration is a process where issues not resolved in bargaining between the employer and union are submitted to binding arbitration.

that he would be able to resume his full duties within two to three weeks. (Id., p. 5). Despite this clearance, it does not appear that the police department scheduled him to work at all between the middle of December and first week of January, 2012.

Although it is unclear from the complaint and additional filings, the plaintiff and the council members had some type of meeting on December 20, 2011 concerning the continuation of his benefits. The council members sent the plaintiff a letter the next day regarding that meeting, but again it is not apparent to the court the exact nature of the conflict, based on the available pleadings and documents. (Doc. 11, Att. 2; Doc. 20, Att. 4).

The day after that letter was sent, the plaintiff was in his basement when he called his daughter.[2] She was worried about her father's recent depression, so she went down to see what was going on. She found him with a gun in his hand, but not pointed at his body. After his daughter took the gun, she called her mother and told her what happened. The plaintiff's wife then

---

[2]The only reference to this crucial series of events in the plaintiff's complaint is a sentence discussing how the plaintiff experienced "an acute stress reaction with anxiety distress due to the situation." (Doc. 6, p. 9). Given the these facts were established, in part, through the plaintiff's testimony to the arbitration panel, (Doc. 20, Att. 3, p. 8), and were further laid out in the defendants' appeal to the Commonwealth Court of Pennsylvania, it unclear why this crucial information was omitted from his complaint.

called a friend who reported the incident to the Pennsylvania State Police.[3]

When the friend called 911, he reported the plaintiff put a gun to his head and threatened to commit suicide in front of his family. State troopers responded to the scene and upon arrival found the plaintiff had already departed for the hospital with his daughter. The troopers headed to the hospital, but were called off when Wilkes-Barre police said he had arrived at Wilkes-Barre General Hospital and agreed to commit himself for treatment. The troopers then returned to the plaintiff's home and seized three of his handguns. (Doc. 11, Att. 2).

A short time later, a member of the Freeland Borough police department became aware of the incident and contacted the state police. The state police reported they responded to a call for the plaintiff who "held a pistol to his head and threatened to commit suicide in front of his family members." After gathering some additional information, the Freeland officer contacted Police Chief Nadine Sist. Chief Sist told the officer to go to the hospital to ensure the plaintiff was not armed and did not pose a threat to himself, his family, or the public. While en route to the hospital, the officer received a call from Wilkes-Barre police that the plaintiff and his daughter had arrived unharmed. When

---

[3]These facts only became apparent during the arbitration hearing when the plaintiff and his family testified. The plaintiff included the findings of the arbitration panel in his brief in opposition to the motion to dismiss. (Doc. 20, Att. 3). They are presented for background purposes and were not known to the defendants until after the plaintiff's suspension and termination.

the officer got to the hospital, he learned that the plaintiff had checked himself in for mental health treatment. All of this information was later communicated to Chief Sist.

Chief Sist contacted council president Robert Quinn, Mayor Tami Martin, and council solicitor Donald Karpovich and apprised them of the situation. She then called the state police to see whether they had seized the plaintiff's service weapon, but they reported they had only found his personal firearms. A subsequent search of the plaintiff's locker revealed his service weapon was left at the police station. (Doc. 11, Att. 2).

Later that same day Chief Sist wrote a letter to the council members informing them of the alleged suicide attempt and later events. At the close of the letter, she requested they consider relieving the plaintiff of his duties for the safety of fellow officers and the safety of the community. She continued to state that "it could not be determined if this kind of action could be repeated and he or others would be placed in harm's way. This is not a circumstance the department should take chances on." (Doc. 11, Att. 2).

On January 2, 2012, Robert Quinn sent a letter on behalf of the Freeland Borough Council notifying the defendant that they were aware of the alleged suicide attempt and the other events that occurred that same day. The council further notified the plaintiff that a hearing would be conducted approximately two weeks later to determine whether the incident constituted grounds for termination under Section 1190 of the Borough Code, 53 P.S.

§46190. The letter informed him of his right to present evidence, as well as council's wish that the plaintiff undergo a mental health evaluation by a doctor selected by the Borough.

The next day, the council held a regularly scheduled meeting and voted to suspend the plaintiff without pay pending a final hearing regarding his conduct. There is nothing to indicate whether the plaintiff was aware of this meeting. Mr. Quinn sent a letter to the plaintiff on January 4 notifying him that the council's decision was based on the allegations contained in two letters sent in December and January, respectively. Again, the court is unsure what allegations were contained in the December 21, 2011 letter as neither party has sufficiently explained the context of that communication. It also appears that the final termination hearing was moved back to accommodate his lawyer's schedule the last day in January. (Doc. 11, Att. 2).

On January 31, 2012, the council members held a hearing to review the plaintiff's actions on December 22, 2011. During the hearing, the Pennsylvania State Police report, the Freeland Borough Police report, and Chief Sist's letter were all read into the record. The plaintiff, who was then represented by counsel, opted not to make a statement, but rather objected to the general accuracy of the reports without getting into any specific details. The plaintiff also submitted two letters from his doctors prepared and dated after the December 22, 2011 incident. One letter indicated that the plaintiff was able to return to work without any physical restrictions. The second letter

7

indicated that the plaintiff "did not present any psychiatric issues or symptoms, which would preclude him from employment." (Doc. 6; Doc. 11, Att. 2).

Approximately one week later the council met and voted to terminate the plaintiff for "conduct unbecoming an officer." The council cited the police reports regarding the plaintiff's alleged suicide attempt as the reason for termination. A subsequent hearing in front of an arbitration panel reversed the decision of the council. Unlike his hearing in front of the council, the plaintiff testified, along with his wife and daughter, about the events that led to his termination. (Doc. No. 20, Att. 3).

## II.    PROCEDURAL BACKGROUND

This case commenced on October 25, 2013 when the plaintiff filed his complaint with this court. (Doc. 1). The amended complaint, filed three weeks later, states four causes of action: (1) Violation of the plaintiff's due process right to a pre-suspension hearing; (2) Violation of the plaintiff's first amendment rights of free speech and association; (3) Disability discrimination in violation of the Pennsylvania Human Relations Act (PHRA) and the Americans with Disabilities Act (ADA); and (4) Violation of the PHRA by the individual defendants by aiding and abetting Freeland Borough. (Doc. 6). The first two counts are brought pursuant to 42 U.S.C. §1983.

The defendants jointly filed a motion to dismiss and brief in support on

November 25, 2013. (Doc. 11; Doc. 12). The plaintiff filed his brief in opposition roughly three weeks later on December 17, (Doc. 20), and the defendants have filed a reply brief. (Doc. 21). The case is now ripe for the court's ruling.

## III.   STANDARD OF REVIEW

The defendant's motion to dismiss is brought pursuant to the provisions of Fed. R. Civ. P. 12(b)(6). This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated, *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005), and dismissal is appropriate only if, accepting all of the facts alleged in the complaint as true, the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1974 (2007) (abrogating "no set of facts" language found in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). The facts alleged must be sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. 544, 127 S. Ct. at 1965. This requirement "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [necessary elements]" of the plaintiff's cause of action. *Id.* Furthermore, in order to satisfy federal pleading requirements, the plaintiff must "provide the grounds of his entitlement to relief," which "requires more than labels and

9

conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (brackets and quotations marks omitted) (quoting *Twombly*, 550 U.S. 544, 127 S. Ct. at 1964-65).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. *Sands v. McCormick*, 502 F.3d 263 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the [attached] documents." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002). However, the court may not rely on other parts of the record in determining a motion to dismiss. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

Generally, the court should grant leave to amend a complaint before dismissing it as merely deficient. *See, e.g., Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007); *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is

justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

## IV.   DISCUSSION

### A.   The Pre-Suspension Hearing

"Well-established federal law recognizes the existence of a property interest in public employment where state law supports a claim of entitlement to continued employment." *King v. School Dist. of Philadelphia*, 2001 WL 856948, *7 (E.D.Pa. July 26, 2001)(citing *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972)). When state law restricts the termination of a public employee except for cause, an entitlement to continued employment is created, vesting a protected property interest. *Id.* (citing *Gilbert v. Homar*, 520 U.S. 924, 928-29 (1997)). "[U]nder Pennsylvania law, a policeman's property interest in his job is protected from either termination or suspension . . . and due process therefore entitles him to a pre-suspension or pre-termination hearing—albeit a brief and informal one." *Schmidt v. Creedon*, 639 F.3d 587, 596 (3d Cir. 2011)(citing *Dee v. Borough of Dunmore*, 549 F.3d 225, 233 (3d Cir.2008)). Pennsylvania law list seven numerated reasons where a borough police officer can be removed, including:

> (1) Physical or mental disability affecting the person's ability to continue in service, in which cases the person shall receive an honorable discharge from service.
> (2) Neglect or violation of any official duty.
> (3) Violation of any law which provided that the violation

constitutes a misdemeanor or felony.
(4) Inefficiency, neglect, intemperance, immorality, disobedience
of orders, or conduct unbecoming an officer.
(5) Intoxication while on duty.
(6) Engaging or participating in conducting of any political or
election campaign while on duty or in uniform or while using
borough property otherwise than to exercise the person's own
right of suffrage.
(7) Engaging or participating in the conduct of a political or
election campaign for an incompatible office as provided in
section 1104(f)

53 P.S. §46190. Here, borough officials removed the plaintiff because they

found his conduct of December 22 to be "unbecoming an officer."

The plaintiff contends that because the defendants failed to hold a pre-

suspension hearing as required by *Cleveland Board of Education v.*

*Loudermill*, 470 U.S. 532 (1985), (a *Laudermill* hearing), they deprived him of

sufficient due process. *Laudermill* requires that "an employee who has a

property interest in continued employment is entitled to pretermination notice

and an opportunity to respond to present reasons why proposed action should

not be taken." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1077 (3d

Cir. 1990). "[A]bsent extraordinary circumstances, policemen cannot be

suspended without pay unless there has been a pre-suspension hearing."

*Schmidt v. Creedon*, 639 F.3d 587, 596 (3d Cir. 2011). The type of process

necessary must be reviewed in light of three specific factors. The court must

consider: first, the impact of official action on private interests; second, the

risk of an unsupported and erroneous deprivation through the procedures

employed and the viability of additional or substitute procedures; and third the

12

interest of the particular government body. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

First, the private impact of the government action must be evaluated in light of the length and finality of the deprivation. *Gilbert v. Homar*, 520 U.S. 924, 932 (1997). Here, the plaintiff was notified that he was to be suspended without pay starting on January 3, 2012. The council requested he get a psychiatric evaluation prior to the hearing originally set for January 14. The defendants then agreed to move his hearing to January 31 in light of his attorney's schedule. Although generally this deprivation is relatively minor, in light of *Schmidt*'s requirement of "extraordinary circumstances" before suspending a police officer without pay and prior to any type of hearing, the court finds the private interest in the plaintiff retaining his employment is great. 639 F.3d at 596.

Next, the court turns to the risk of erroneous deprivation. "[W]hen an individual is not provided with any form of pre-deprivation process, as in this case, the risk of an erroneous deprivation of his constitutionally protected interest . . . is heightened considerably." *Dee v. Borough of Dunmore*, 549 F.3d 225, 232 (3d Cir. 2008). In *Solomon v. Philadelphia Housing Authority*, 143 F.App'x 447 (3d Cir. 2005), the Philadelphia Housing Authority (PHA) learned via a draft affidavit that one of their police officers was going to be arrest imminently. Although the PHA was notified in April of the impending arrest, no arrest or prosecution was forthcoming in the following weeks or

13

months. Seven months later, the plaintiff was suspended without pay based on information stemming from the affidavit and the PHA's investigation. *Id.* at 449-50. As opposed to *Gilbert* where the plaintiff was already arrested and charged with a crime, the Third Circuit in *Solomon* did not find sufficient justification for a suspension without a pre-deprivation hearing. That court specifically cited the fact that an arrest had not been made in nearly seven months, the conflicting stories about the basis for the arrest, and the plaintiff's denial of the accusations against him as reasons for requiring some type of hearing prior to the imposition of a suspension. This uncertainty created "a substantial risk of an erroneous deprivation." *Solomon*, 143 F.App'x at 454.

This case appears to fall between *Gilbert* and *Solomon*. Although the council relied upon police reports from both the Pennsylvania State Police and the Freeland Borough police department, the plaintiff was never arrested or charged with a crime. Moreover the information came from various sources as the initial 911 call was made by a friend of the family. The officers who arrived at the scene collected the plaintiff's guns, but did not take any statements regarding what happened from the family.

The court does not doubt the veracity of Chief Sist's letter or the reports she relied upon, but the information conveyed to her came mainly from another officer within her department. That officer communicated with numerous sources, including the Pennsylvania State Police and the Wilkes-Barre Police. Often critical information can be lost or altered during these

14

various transmissions. The fact this information was received from numerous parties over a period of time increases the risk of inaccurate information impacting the council's decision.  This is not a case where "an independent third party has determined that there is probable cause to believe the employee committed a serious crime." *Gilbert*, 520 U.S. at 934. Here, as in *Solomon*, the court does not call into question the truthfulness of the reporting of the facts from the various police agency. However, the inherent risk of erroneous information influencing the defendants' decision creates "a substantial risk of an erroneous deprivation if that employee is suspended without any pre-deprivation process." *Solomon*, 143 F.App'x at 454.

Finally, the court will address the government's interest. When a government body "must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). The pre-deprivation procedures need not be particularly elaborate or thorough. The minimal requirements include a notice of the allegations against him, an explanation of the evidence, and an opportunity to respond. *Schmidt*, 639 F.3d at 596.

*Solomon* again provides guidance as the Third Circuit found that given the plaintiff was on medical leave, he did not pose nearly the same threat as an officer who was scheduled for duty. 143 F.App'x at 254. Although there is no doubt that the government interest is extremely high in this case given the

15

allegations that a borough police officer placed a gun to his head, threatened to commit suicide, and then voluntarily check himself in for mental treatment, other facts weigh against depriving the plaintiff of his pre-deprivation due process.

First, there is no evidence that the plaintiff was scheduled to work at anytime after the date of the alleged incident. In fact, it appears he was still on medical leave up until the time he was suspended. *See Solomon*, 143 F.App'x at 454 (noting that where employee was out on continuing medical leave holding a hearing prior to termination would not impose a significant administrative burden or intolerable delays). Second, twelve days passed between the incident and when the council voted to suspend the plaintiff without pay. Although this period also encompassed both Christmas and New Year, it is unclear what actions were taken during that period and whether the plaintiff was informed of the council's January 3 meeting. Finally, the borough and council members have not indicated how "providing such limited pre-suspension hearings would impose any administrative or fiscal burden." *Schmidt*, 636 F.3d at 597. Discovery is necessary to determine what happened in that time period and what actions the council members took. For those reasons, the motion to dismiss the procedural due process claim is denied at this time.

B.    First Amendment Retaliation

16

"[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out.*" Hartman v. Moore*, 547 U.S. 250, 256 (2006). "To establish a claim for First Amendment retaliation, a plaintiff must demonstrate that he: '(1) engaged in constitutionally protected speech; (2) was subjected to adverse action or deprived of some benefit; and (3) his protected speech was a `substantial' or `motivating factor' in the adverse action.'*" Infantino v. West Wyoming Borough*, 2013 WL 3972770, \*3 (M.D.Pa. July 31, 2013)(quoting *Billman v. Corbett*, 2011 WL 605814 (E.D.Pa. Feb. 15, 2011)).

The plaintiff appears to be resting mainly on the temporal proximity of the plaintiff's speech and the alleged retaliation. In early September 2011, plaintiff in his capacity as chair of the union's bargaining committee informed the Borough and council members that the union would be initiating interest arbitration. (Doc. 6, p. 6-7). Although the allegations are vague, all of the claims of retaliation noted in the complaint such as the suspension, the false accusations of criminal wrongdoing, and the termination occurred on or after December 21, 2011. The Third Circuit Court of Appeals has held that a plaintiff can establish the requisite causal connection by proving either: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)(citing *Krouse v. American Sterilizer Co.*, 126

F.3d 494, 503-4 (3d Cir.1997); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-21 (3d Cir.1997)). That Court has also cautioned, however, that "[i]t is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 178 (3d Cir.1997); *see also Marra*, 497 F.3d at 302.

The plaintiff's conduct of notifying the council of the union's intentions and, at the least, council's threat of removing his benefits are sufficient to satisfy the first two elements. What is unclear is whether the plaintiff has sufficiently demonstrated causation. The three month lapse between his alleged protected activity and the first adverse action does not create an inference of causation. Courts have been reluctant to find causation where the temporal proximity is removed by more than a few days. *See Fischer v. Transue*, 2008 WL 3981521, *10 (M.D. Pa. Aug. 22, 2008)(period of twenty-two days insufficient to find causation without additional evidence); *Killen v. N.W. Human Servs., Inc.*, 2007 WL 2684541, at *8 (E.D.Pa. Sept.7, 2007)(temporal proximity of seventeen days was insufficient to establish causation); *see also*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)(noting that three-month lapse is likely insufficient alone to demonstrate causation).

When the temporal proximity fails, the court must look for either a

pattern of antagonism or the sum of the allegations to find causation *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)(citing *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir.1997)). Such inference can be made when an employer gives inconsistent reasons for termination, *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir.1986), engages in a series of seemingly benign actions that essentially paved the way for an employee's termination, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997), or attempts to provoke the employee by continually disciplining him for minor matters and miscalculating the amount of time he worked. *Robinson v. SEPTA*, 982 F.2d 892, 895 (3d Cir. 1993). If the plaintiff's allegations about the defendants suspending him without due process, disparaging him about his injuries, pressuring him to return to work, and removing his benefits without just cause are found to be true, then this could lead to an inference of causation. For those reasons, the defendants' motion to dismiss the first amendment retaliation claim is denied.

 

      C.    Qualified Immunity

Having found that the complaint establishes a violation of his due process and free speech rights, the court must analyze whether the council members are shielded by qualified immunity. "When a defendant asserts the affirmative defense of qualified immunity, however, the court must determine as a threshold matter whether the defendant is entitled to that defense." *D.R.*

19

*by L.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364, 1367-68 (3d Cir. 1992). Qualified immunity protects government officials when performing "discretionary functions . . . if their conduct did not violate a clearly established statutory or constitutional right of which a reasonable person would have known.*" Richardson v. Kane*, 11-CV-2266, 2013 WL 1452962, \*12 (M.D.Pa. 2013). Qualified immunity grants "not merely a defense to liability, but rather, immunity from suit" and "affords ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* Of course, this inquiry varies depending "largely upon the level of generality at which the relevant legal rule is to be identified." *Wilson v. Layne*, 526 U.S. 603, 614 (1999). The Supreme Court has said:

> In *Anderson*, we explained that what clearly established means in this context depends largely upon the level of generality at which the relevant legal rule is to be identified. Clearly established for purposes of qualified immunity means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 614-15.

The first question the court must answer is whether the council members would have been aware that suspending a police officer for a period of several weeks without pay violated his clearly established constitutional rights. The court must review this determination in light of the reports from, at

least, two police departments that indicated the plaintiff had placed a gun to his head and threatened to take his own life. The Third Circuit generally requires a pre-deprivation hearing for a police officer suspended without pay, save for "extraordinary circumstances." *Schmidt*, 639 F.3d at 596. As discussed above, in weighing the *Mathews* factors, the court found that the government's interest in public safety is great when a police officer exhibits extreme suicidal actions. There is sufficient legal ambiguity as to what circumstances sufficiently constitute "extraordinary circumstances" under *Schmidt*. Therefore the council members are entitled to qualified immunity as to the due process claim. *See McCarthy v. Darman*, 372 F.App'x 346, 350-51 (3d Cir. 2010)(finding that borough council was justified in suspending police chief without a pre-deprivation hearing when he retracted his intent to retire one day before the acting chief was to take over department).

As for the plaintiff's first amendment claim, the question is whether a reasonable person would recognize that they could not take various adverse actions against the defendant for informing them of the union's intent to proceed with interest arbitration. "In some circumstances, the legitimate basis for the actions might be so apparent that the plaintiff's allegations of retaliatory motive could not alter the conclusion that under the circumstances

21

alleged in the pleadings, the defendants would have been compelled to reach the same decision even without regard for the protected First Amendment activity." *Larsen v. Senate of Comm. of Pa.*, 154 F.3d 82, 95 (3d Cir. 1998). However, qualified immunity is not appropriate given that it is well-established that one cannot retaliate against an individual for exercising his right of expression in his capacity as a union member.  Moreover, given the nature of the suspension, the fact that it was overturned in arbitration, and that determination was upheld by the Commonwealth Court of Pennsylvania, it is unclear whether the defendants would have reached the same decision had the retaliatory motive not existed. Qualified immunity does not bar the first amendment claims against the council members at this stage of the proceedings.

### D. *Monell* Liability

The defendants' also argue that the plaintiff has failed to present a sufficient *Monell* failure-to-train claim. Generally, *Monell* claims are brought against employees or officials that are subordinate to the policymakers of a particular government entity, such as police officers. The plaintiff alleges that the Borough essentially failed to train itself - that the Borough did not properly train its legislative and policymaking body, the council, in dealing with employees exercising their first amendment rights. The plaintiff also claims

22

the council was inadequately trained in terms of ensuring due process when they are stripping an individual's property interest in his continued employment.

It is well established that "a municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under §1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978)*; Grayson v. Mayview State Hosp.*, 293 F.3d 103 (3d Cir. 2002). Therefore, a municipal defendant "can only be liable when the alleged constitutional violation implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Para v. City of Scranton*, 2008 WL 2705538, *17 (M.D. Pa. July 10, 2008) (citing Monell, 436 U.S. at 694). Moreover, "[t]o establish that a policy is in violation of the constitution, a single incident by a municipal employee is insufficient to establish that an official custom or practice caused the alleged constitutional violation." *Para*, 2008 WL 2705538, at *19 (citing Oklahoma City v. Tuttle, 471 U.S. 808, 822, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

A single violation may be sufficient in some circumstances. The plaintiff relies on language contained in *Pembaur v. City of Cincinnati*, that reads:

> No one has ever doubted, for instance, that a municipality may be liable under §1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes

23

an act of official government policy.

475 U.S. 469, 487 (1986). The Court went on to establish a relatively narrow holding that "municipal liability under §1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. However, "*Monell* is a case about responsibility." 475 U.S. at 478. Rather than a separate and distinct route of recovery, it is necessary for the plaintiff to demonstrate that he suffered a constitutional violation and the violation stemmed from the borough's official policy. It appears that under these circumstances, the Borough defendant may be held liable if the unconstitutional actions are so enacted as the Borough's policy. *See Langford v. City of Atlantic City*, 235 F.3d 845, 850. In this case, the *Monell* claim is part and parcel to the plaintiff's due process and free speech claims against the Borough, not a distinct route of recovery. It appears the council is the Borough's policymaking body. If that is so, any action it takes would necessarily establish official policy, thereby creating potential liability under *Monell*. As such, the motion to dismiss is denied because the *Monell* theory of liability is a necessary part of the facially valid §1983 claims discussed above.

### E. The Plaintiff's ADA Claim

A "disability" is statutorily defined by the ADA as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). "[I]t is not clear from the text of the ADA itself whether nondisabled individuals are permitted to sue for violations of 42 U.S.C. §12112(d)," the statutory provision regarding discrimination due to disability. *Tice v. Centre Area Transp. Authority*, 247 F.3d 506, 516-17 (3d Cir. 2001).

The plaintiff alleges that the defendants "admitted that they fired the plaintiff because of an alleged mental infirmity." (Doc. 6). "To prevail on a claim of this kind, a plaintiff must show that the employer either 'mistakenly believed that [the employee has] a physical impairment that substantially limits one or more major life activities' or 'mistakenly believed that an actual non-limiting impairment substantially limits one or more major life activities.'" *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 187-88 (3d Cir. 2010)(citing *Wilson v. MVM, Inc.*, 475 F.3d 166, 179 (3d Cir.2007)). To qualify as an appropriate disability, the alleged impairment can neither be either "transient, nonpermanent condition," *McDonald v. Commonwealth*, 62 F.3d 92, 97 (3d Cir. 1995), nor "a temporary, non-chronic impairment of short duration." *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 380 (3d Cir.2002). If there are insufficient facts to establish that "his employers thought that [the plaintiff's

25

mental] problems were going to last for an extended period of time, as required under the ADA," then the claim cannot stand. *Sulima*, 602 F.3d at 188.

Here, the plaintiff alleges that he was mentally fit for the job as of January 13, 2011. (Doc. 6, p. 9; Doc. No. 11, Att. 2). Even in his own pleadings, the plaintiff characterizes his actions on December 22 as "an emotional moment" caused by "an acute stress reaction with anxiety." He further claims that the defendants "made defamatory comments about his confidential medical emotional condition." The plaintiff unequivocally states that he did "not have such mental infirmity and was cleared to return to work" approximately three weeks after the incident. (Doc. 6, p. 9). The plaintiff has only alleged his mental impairment was a fleeting and temporary "emotional moment" and his supporting documentation shows he was terminated on other grounds.

The plaintiff also alleges that the "defendants fired him because of an alleged mental infirmity," however, attached to his brief in opposition to the motion to dismiss is a letter from the borough council detailing the reasons for his dismissal. (Doc. 20, p. 15). In that letter, it states that the plaintiff was terminated for conduct unbecoming an officer. (Doc. 20, Att. 2). Moreover, the plaintiff's challenge of the council's decision before the arbitration panel was premised only upon the issue of whether his conduct was unbecoming of an officer. (Doc. 20, Att. 3). When the borough appealed the case to the

Commonwealth Court of Pennsylvania, *Freeland Borough v. Unemployment Compensation Bd. of Review*, 2012 WL 8682069, *1 (Comm. Ct. Pa. Nov. 30, 2012)[4], that court noted the council "discharged Claimant for conduct unbecoming a police officer, and for allegedly violating Employer's policy." The plaintiff's complaint is undermined by the very supporting evidence he presents. There is nothing to indicate his termination was based on his mental disability and it appears that the defendants did not consider him disabled. In sum, the factual allegations and supporting documentation establish the defendants did not consider him disabled within the meaning of the ADA. His mere elemental recitation that the defendants fired him because he had a mental infirmity is insufficient as a matter of law. As such, any claim arising under the ADA fails.

Further, there does not appear to be any basis to hold the council members liable as individuals under the ADA. "In the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose—to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well." *Newman v. GHS Osteopathic, Inc., Parkview Hosp. Div.*, 60 F.3d 153, 157 (3d Cir. 1995). The

---

[4]The plaintiff makes reference to this case on page 4 of his brief, but did not give the cite. The court was able to find the case through its own research.

Third Circuit is "persuaded that Congress did not intend to hold individual employees liable under Title VII." *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996).

In dicta, the Third Circuit has also stated "there appears to be no individual liability for damages under Title I of the ADA." *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002)(citing *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1280 n. 4 (7th Cir.1995)). In his amended complaint and brief in opposition, the plaintiff has made it clear that he is proceeding against the council members in their individual capacities only and does not pursue remedies against them in their role as council members.[5] (Doc. 20, p. 16). Any claim against the individual defendants is further barred because the ADA does not impose individual liability. *See McInerney v. Moyer Lumber and Hardward, Inc.*, 244 F.Supp.2d 393, 398 (E.D.Pa. 2002)("[A] growing number of district courts in this Circuit have concluded that there is no individual liability under the ADA, and this appears to be the consensus view.").

The plaintiff alternatively requests that if the court dismisses any of his claims, that he be granted leave to amend. (Doc. 20, p. 15). The court finds

_____

[5]The defendants also move to dismiss any claim for punitive damages against the council members acting in their official capacity, but the complaint only seeks punitive damages against the council members in their individual capacity. (Doc. 6, p. 10). As such, the plaintiff has properly plead punitive damages.

any leave to amend would be futile as the allegation that the defendants "regarded him as disabled based on their claim that he was allegedly mentally infirm," (Doc. 6, p. 9), is the sole basis for his ADA and PHRA claim. The plaintiff has already filed an amended complaint in this case, (Doc. 6), and the evidence presented contradicts his assertions. As stated above, the plaintiff supplied this court with a letter from the defendants and a memo from the arbitration panel that both note the plaintiff's termination was based on conduct unbecoming an officer. (Doc. 20, Att. 2, 3). Moreover, there is no individual liability against the council members. For those reasons, the plaintiff's ADA claims are **DISMISSED WITH PREJUDICE**.

###### F.    The PHRA Claim

"The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds." *Bialko v. Quaker Oats Co.*, 434 F.App'x 139, 142 n.5 (3d Cir. 2011). Given the above discussion regarding the plaintiff's ADA claims, his claims under the PHRA, including his aiding and abetting claims against the council members, fail and are **DISMISSED WITH PREJUDICE**.

## V.    CONCLUSION

For the reasons discussed above, the defendants' motion to dismiss is

**GRANTED IN PART** and **DENIED IN PART**. The plaintiff's claims of violations of procedural due process and first amendment retaliation will proceed against the Borough. As for the individual defendants, only the first amendment claim will proceed, while the due process claim against them is **DISMISSED WITH PREJUDICE** as they are entitled to qualified immunity. The claims arising under the ADA and the PHRA are **DISMISSED WITH PREJUDICE** as to all defendants. An appropriate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: April 29, 2014**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-2634-01.wpd