# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SCOTT D. MICHALESKO,** | : |
|     **Plaintiff** | :    **CIVIL ACTION NO. 3:13-2634** |
| **v.** | :    **(MANNION, D.J.)** |
| **FREELAND BOROUGH,** *et al.,* | : |
|     **Defendants** | : |

## MEMORANDUM

### I. INTRODUCTION

Presently before the court is a Motion for Summary Judgment filed by Robert Quinn, John Budda, John Potoskie, Rick Wenner, Barbara Tulanowski, Joseph Palko, Jr., and Daniel Bobby (hereinafter referred to collectively as the "council members"). As discussed below, the court will **GRANT** this motion.

### II. FACTUAL BACKGROUND

The plaintiff, Scott D. Michalesko, was a police officer for the Freeland Borough police department for approximately twelve years. On August 12, 2011 he suffered various injuries, including two broken elbows, a broken wrist, bruised ribs, and a facial injury, while making an arrest. The day after he was injured, he requested, and was granted, Heart and Lung benefits based on his physical ailments. (Doc. 6, p. 4).

The plaintiff served as a volunteer firefighter for the Fearnots Fire

Company while he was an employee of the Freeland Borough, including during the time he was receiving Heart and Lung benefits from the Freeland Borough. He did not make the Freeland Borough aware of his continued service at Fearnots Fire Company while receiving Heart and Lung benefits. (Doc. 45, p. 6). On November 17, 2011, the plaintiff responded to a two-car accident in his capacity as a firefighter for the Fearnots Fire Company, at which time he worked for at least 15 minutes independently prying open a car door, operated the Jaws of Life alone, and appeared to show normal range of motion and no pain. (Doc. 45, Ex. J).

On December 6, 2011, Donald G. Karpowich, the Freeland Borough Solicitor, sent a letter to the plaintiff stating that "it has been brought to the attention of the Freeland Borough Council that you have recovered from your injury through which you are receiving benefits under the Heart and Lung Act" and that if the plaintiff had made a recovery he would no longer be entitled to Heart and Lung benefits. (Doc. 45, p. 7). The letter further stated that a meeting, which would be held on December 20, 2011, would proceed pursuant to the requirements of *Cleveland Board of Public Education v. Loudermill*. Namely, to would provide an opportunity for both the town and the plaintiff to present evidence regarding the plaintiff's eligibility for benefits. 467 U.S. 1204 (1984).

The plaintiff and the council members attended a meeting on December 20, 2011 concerning the continuation of his benefits. The following day,

December 21, 2011, the council members sent the plaintiff a letter regarding the disciplinary issues that had arisen while he was on medical leave. (Doc. 11, Ex. 2; Doc. 20, Ex. 4). The plaintiff received the letter on December 22, 2011. The letter requested that the plaintiff attend a December 31, 2011 hearing, and cited an incident where the plaintiff allegedly made derogatory comments toward another employee, alleged acts of insubordination, the plaintiff's involvement with the Fearnots Fire Company, and comments allegedly made by the plaintiff regarding his failure to pass his "firearm qualifications." (Doc. 45, p. 10).

Upon reading the letter on December 22, the plaintiff began to cry in his basement and then called his daughter. She found him with a gun in his hand, but not pointed at his body. She took the gun from him and then called her mother to tell her what had happened. The plaintiff's wife then called a friend who called 911. The friend reported that the plaintiff put a gun to his head and threatened to commit suicide in front of his family. Upon arrival at the scene, the State Troopers found that the plaintiff had already departed for the hospital with his daughter. The troopers headed to the hospital, but were called off when Wilkes-Barre police said he had arrived at Wilkes-Barre General Hospital and agreed to commit himself for treatment. The troopers then returned to the plaintiff's home and seized three of his handguns. (Doc. 11, Ex. 2).

Shortly thereafter, a member of the Freeland Borough police department

became aware of the incident and contacted the state police for information. The state police reported that they had responded to a call about the plaintiff who had "held a pistol to his head and threatened to commit suicide in front of his family members." (Doc. 45, Ex. R). The Freeland officer contacted Freeland Police Chief Nadine Sist, who told the officer to go to the hospital to ensure the plaintiff was not armed and did not pose a threat to himself, his family, or the public. While en route to the hospital, the officer received a call from the Wilkes-Barre police informing him that the plaintiff and his daughter had arrived unharmed. When the officer arrived at the hospital, he learned that the plaintiff had voluntarily checked himself in for mental health treatment.

Later that same day, Chief Sist wrote a letter to the council members informing them of the alleged suicide attempt and surrounding events. At the close of the letter, she requested they consider relieving the plaintiff of his duties in the interest of the safety of fellow officers and the community at large. She continued to state that "it could not be determined if this kind of action could be repeated and he or others would be placed in harm's way. This is not a circumstance the department should take chances on." (Doc. 11, Ex. 2).

On December 28, 2011, Richardson Todd Eagan, Esq., who was at that time representing the plaintiff, responded to the Freeland Borough's December 21, 2011 letter. This letter accused the Freeland Borough officials of unprofessional conduct and advised that the plaintiff would not be present

at the December 31, 2011 meeting because he had a conflict and the plaintiff was entitled to counsel. (Doc. 45, Ex. N).The plaintiff acknowledges that the December 31, 2011 meeting was meant to address the issues presented in the December 21, 2011 letter.

On January 2, 2012, Robert Quinn, on behalf of the Freeland Borough Council, sent a letter to the plaintiff notifying him that they were aware of the alleged suicide attempt and the other events that occurred that same day. (Doc. 45, Ex. T). The council further notified the plaintiff that a hearing would be conducted on January 14, 2012 to determine whether the incident constituted grounds for termination under Section 1190 of the Borough Code, 53 P.S. §46190. *Id*. The letter also informed the plaintiff of his right to present evidence, as well as the council's wish that the plaintiff undergo a mental health evaluation by a doctor selected by the Borough. *Id*.

On January 3, 2012, the council held a regularly scheduled meeting and voted to suspend the plaintiff without pay for violations of Borough policy pending a final hearing regarding his conduct. (Doc. 45, p. 15). It is unclear whether the plaintiff was aware of this meeting. On January 4, 2012, Mr. Quinn sent a second letter to the plaintiff notifying him that the council's decision was based on the allegations contained in the December 21, 2011 letter and pending further hearing on the January 2, 2012 letter. (Doc. 45, Ex. V).

On January 31, 2012, the council members held a hearing to review the

plaintiff's actions of December 22, 2011. (Doc. 45, Ex. A). During the hearing, the Pennsylvania State Police report, the Freeland Borough Police report, and Chief Sist's letter were all read into the record. The plaintiff, who was then represented by present counsel, opted not to make a statement, but rather objected to the general accuracy of the reports without providing any specific details. The plaintiff submitted two letters from his doctors prepared and dated after the December 22, 2011 incident. One letter indicated that the plaintiff was able to return to work without any physical restrictions. The second letter indicated that the plaintiff "did not present any psychiatric issues or symptoms, which would preclude him from employment." (Doc. 6; Doc. 11, Ex. 2).

On February 6, 2012, the Freeland Borough sent a letter to the plaintiff indicating that his employment with the Borough had been terminated for "conduct unbecoming an officer." (Doc. 45, Ex. Y). Subsequently, the plaintiff filed a grievance with the Borough, which was then denied by Chief Sist on March 5, 2012. (Doc. 45, Ex. AA). The plaintiff then appealed the decision to Mayor Tammy Martin, who upheld the termination. (Doc. 45, Ex. BB). The mayor's decision was then appealed to the Freeland Borough Council, who denied the appeal. (Doc. 45, Ex. DD). On April 11, 2012, the plaintiff then elected to pursue his appeal with binding arbitration. (Doc. 45, Ex. FF).

On March 19, 2013, a hearing in front of an arbitrator reversed the decision of the council. Unlike his hearing in front of council, the plaintiff

testified, along with his wife and daughter, about the events that led to his termination. (Doc. 20, Ex. 3). The arbitrator sided with the plaintiff and ordered that he be reinstated and given back pay. *Id.* However, the plaintiff was to be withheld from active duty until he received a psychological assessment. *Id*. The plaintiff claims that the arbitrator's award of reinstatement was not followed. (Doc. 53, p. 20).

Independent of the preceding, on June 1, 2011, the plaintiff and Robert Maholik, who was Freeland Borough's only full-time police officer at the time, informed the Freeland Borough Council of their intention to pursue collective bargaining. (Doc. 45, Ex. GG). The plaintiff and Mr. Maholik then submitted a list of demands. Defendant Quinn called their proposal "a joke" at a Borough Council meeting. (Doc. 45, Ex. A).

On September 6, 2011, the plaintiff informed the Freeland Borough Council that he intended to proceed with binding interest arbitration.[1] Robert Maholik's employment ended prior to the plaintiff's August 12 injury and he was replaced in the "bargaining unit" with Officer Williams, who was also a full-time officer. The parties met on September 17, 2011 to discuss the terms of the collective bargaining agreement. (Doc. 45, Ex. A). On October 26, Mr. Karpowich was selected to be the arbitrator by the Freeland Borough. (Doc. 45, Ex. MM). On January 23, 2012, the Freeland Borough entered into a

---

[1]Interest arbitration is a process where issues not resolved in bargaining between the employer and union are submitted to binding arbitration.

7

collective bargaining agreement with the full-time police officers.

The plaintiff alleges that starting in early December, 2011, the defendants, who were members of the Freeland Borough council during this period, engaged in a campaign of harassment against him as well as anti-union activity. As to anti-union activity, the plaintiff's testimony essentially equates the Borough's alleged unwillingness to "come to a happy medium" with anti-union activities. (Doc. 45, Ex. A). As to a campaign of harassment, the plaintiff's testimony simply cited "heated" exchanges during negotiations and the Freeland Borough Fire Chief coming to the Foster Fire Department to stare at his car. *Id*.

### III.    PROCEDURAL BACKGROUND

This case commenced on October 25, 2013 when the plaintiff filed his complaint with this court. (Doc. 1). The amended complaint, filed three weeks later, states four causes of action: (1) Violation of the plaintiff's due process right to a pre-suspension hearing; (2) Violation of the plaintiff's first amendment rights of free speech and association; (3) Disability discrimination in violation of the Pennsylvania Human Relations Act (PHRA) and the Americans with Disabilities Act (ADA); and (4) Violation of the PHRA by the individual defendants by aiding and abetting Freeland Borough. (Doc. 6). The first two counts are brought pursuant to 42 U.S.C. §1983.

The defendants jointly filed a motion to dismiss and brief in support on

November 25, 2013. (Doc. 11; Doc. 12). The plaintiff filed his brief in opposition roughly three weeks later on December 17, 2013, (Doc. 20), and the defendants have filed a reply brief. (Doc. 21).

On April 29, 2014, the court issued a memorandum (Doc. 26) and order (Doc. 27) granting in part and denying in part the defendants' motion to dismiss. The court allowed to proceed the due process and first amendment violation claims, and the first amendment retaliation claims against individually named defendants. (Doc. 27). This court dismissed with prejudice the due process claims against individually named defendants, and the claims arising under the ADA. (Doc. 27).

On August 29, 2014, the defendants jointly filed a motion for summary judgment. (Doc. 44). They filed a brief in support on September 5, 2014. (Doc. 48). On October 2, 2014, the plaintiff filed a brief in opposition. (Doc. 54). On October 16, 2014, the defendants jointly filed a reply brief. (Doc. 57).

**IV.    STANDARD OF REVIEW**

Summary judgment is appropriate "if the pleadings, the discovery [including, depositions, answers to interrogatories, and admissions on file] and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901

F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Aetna Cas. & Sur. Co. v. Ericksen, 903 F. Supp. 836, 838 (M.D. Pa. 1995). At the summary judgment stage, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249; see also Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (a court may not weigh the evidence or make credibility determinations). Rather, the court must consider all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007).

To prevail on summary judgment, the moving party must affirmatively identify those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323-24. The moving party can discharge the burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003); see also Celotex, 477 U.S. at 325. If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts," but must show sufficient evidence to support a jury verdict in its favor. Boyle v. County of Allegheny,

139 F.3d 386, 393 (3d Cir. 1998) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

## V. DISCUSSION

### A. The Validity of the Deprivation of Due Process Claim

The Due Process Clause of the Fourteenth Amendment states: "nor shall any State deprive a person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, §1. There are two parts to a procedural due process analysis: "(1) whether the plaintiff has a property interest protected by procedural due process, and (2) what procedures constitute due process of law." Schmidt v. Creedon, 639 F.3d 587, 595 (3rd Cir. 2011).

Under Pennsylvania law, "a policeman's property interest in his job is protected from either termination or suspension, and due process therefore entitles him to a pre-suspension or pre-termination hearing – albeit a brief and informal one." Schmidt, at 596. Before an individual may be deprived of a

property interest, "some form of hearing is required." Matthews v. Eldridge, 424 U.S. 319, 333 (1976).

The central question here is whether summary judgment should be entered on the deprivation of procedural due process claim where the plaintiff failed to appear at a hearing concerning the conduct for which he was suspended without pay. The defendant contends that the answer to this question should be "yes." The defendant also argues that the plaintiff's claim is "inappropriate, deceptive, and frivolous" because it is clear from the record that the plaintiff was offered a hearing regarding the issues on which he was to be suspended and that the plaintiff elected not to attend the meeting. (Doc. 48, p. 8-9).

It is important to note the timeline here. On December 21, 2011, the plaintiff received written notice of the charges against him. He was given the opportunity to attend a hearing to be held on December 31, 2011, at which time he would be able to offer evidence to address the charges. The plaintiff did not attend this meeting, and admits he chose to forgo the meeting on the advice of his counsel. On January 3, 2012, the Freeland Borough Council then voted to suspend the plaintiff because of the conduct detailed in the December 21, 2011 letter. On January 4, 2012, a letter was sent to the plaintiff that set a hearing for January 14, 2012 to determine whether the plaintiff should be suspended or terminated.

The plaintiff argues that he was "clearly" not provided due process

because "the letter was not received by Plaintiff until after 1/11/2012, but yet was effective the day before." (Doc. 54, p. 4). This is misleading, at best. It is undisputed that the defendant received a letter on December 22, 2011 informing him of the charges against him and inviting him to attend a hearing...a hearing that the plaintiff's attorney advised him not to attend. Further, the January 4, 2012 letter explained that he was being suspended based upon the conduct presented in the December 22, 2011 letter.

### B. Whether the Plaintiff Engaged in Conduct Protected by the First Amendment

The First Amendment of the United States Constitution reads: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The First Amendment is applied to local and state governments through the due process clause of the Fourteenth Amendment. Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 603 (1982). The First Amendment is enforced through 42 U.S.C. §1983. Marra v. Philadelphia Housing Auth., 497 F.3d 286, 295 (3rd Cir. 2007).

The elements for a First Amendment Retaliation claim, as articulated by the Third Circuit are: "(1) constitutionally protected conduct, (2) retaliatory

action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Thomas v. Independence Township, 463 F.3d 285, 296 (3rd Cir. 2006). A public employee's First Amendment right to speak freely on matters of public concern is to be balanced against the efficient operation of the workplace. Pickering v. Board of Education, 391 U.S. 563, 568 (1968). In order to meet this balancing requirement, the following elements from Pickering must be met: (1) that the speech involved a matter of public concern; (2) that his or her interest in the speech outweighed the government employer's countervailing interest in providing efficient and effective services to the public; and (3) that the speech was a substantial or motivating factor in the alleged retaliatory action. Brennan v. Norton, 350 F.3d 399, 412-414 (3rd Cir. 2003).

"If the employee's speech relates only to his or her personal interest, the First Amendment does not protect the speech." Borden v. School District of the Township of East Brunswick, 523 F.3d 153, 168 (3rd Cir. 2008). However, a union leader's speech is generally protected. Fuerst v. Clarke, 454 F.3d 770, 774 (7th Cir. 2006). With respect to collective bargaining, the Supreme Court stated:

> When a labor organization has been selected as the exclusive representative of the employees in a bargaining unit, it has a duty, implied from its status under §9(a) of the NLRA as the exclusive representative of the employees in the unit, to represent all members fairly. As we described in *Vaca v. Sipes,* [386 U.S. 171,

14

> 177, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967)], the duty of fair representation requires a union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. Marquez v. Screen Actors Guild, 525 U.S. 33, 44, 119 S. Ct. 292 (1998).

The conduct in question is the request for the initiation of interest arbitration and the alleged "campaign of harassment" carried out by the defendants against the plaintiff. (Doc. 6, ¶¶ 25-26). The defendants argue that the plaintiff cannot state a claim under §1983 because this union activity was not protected under the First Amendment. (Doc. 48, p. 13).

The plaintiff's retaliation claim is based upon his request for interest arbitration. The plaintiff's bargaining group, however, consisted of only the plaintiff and Officer Matthew Williams, who was simply seeking a contract and offering no dispute. The plaintiff stated that "...more or less, it was me by myself" in the negotiation. (Doc. 48, p. 15). These facts clearly demonstrate that the plaintiff was negotiating his own terms of employment, as opposed to a contract for a group of union members. As such, this conduct in no way indicates that the plaintiff was engaged in any public or associational negotiations necessary to make a successful First Amendment collective bargaining claim.

In the plaintiff's brief in opposition, he appears to argue that the termination of another officer, Officer Maholik, in the summer of 2011 for his "union activities" demonstrates that he was involved in protected activities.

15

(Doc. 54, pp. 16-18). However, there is no evidence regarding the circumstances surrounding this termination and no indication that this termination was improper.

### C. Whether the Plaintiff can Establish Causation to Support His Claim for First Amendment Retaliation

The defendants next contend that the plaintiff is unable to establish the causation element for his First Amendment retaliation claim. With respect to the issue of causation, the Third Circuit laid out the following test:

> To establish the requisite causal connection, the plaintiff must prove either: (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.
> Cooper v. Menges, 541 Fed. Appx. 228, 232 (3rd Cir. 2013).

Given the approximately three (3) month gap between the plaintiff's request for interest arbitration and the first applicable act by an individual defendant, it would be difficult to meet the "temporal proximity" and "pattern of antagonism" requirements set out by the Third Circuit in Cooper. 541 Fed. Appx. 228, 232 (3rd Cir. 2013).

The timeline here is also of critical importance. The plaintiff requested interest arbitration in September of 2011. The Freeland Borough then invited both the plaintiff and Officer Williams to a negotiation meeting on September

17, 2011. As the defendants point out, it was thus on September 17, 2011 that the "theoretical clock" on this First Amendment claim began to run. (Doc. 28, p. 17). It was not until December 6, 2011 that the first allegedly adverse action occurred. It was on this day that Mr. Karpowich sent the letter to the plaintiff regarding the Heart and Lung benefits. The defendants cite a series of Third Circuit cases holding that gaps between the protected activity and the termination ranging from three (3) weeks to four (4) months was insufficient to demonstrate causation. (Doc. 28, pp. 17-18).

To support his claim, the plaintiff offers evidence of two primary events within this time period: (1) the Freeland Borough Fire Chief went to Fearnots Fire Company to check on him; and (2) the Freeland Borough delayed the approval of the collective bargaining agreement. First, in light of the fact that the Freeland Borough was made aware of the fact that the plaintiff was simultaneously receiving Heart and Lung benefits from the Freeland Borough and volunteering with the Fearnots Fire Company (including using Jaws of Life to pry open car doors), it is perfectly reasonable for the Freeland Borough Fire Chief to check in on the situation. Second, the delay in approving the collective bargain agreement was in no way part of a pattern of hostility towards the plaintiff. Following the September 17, 2011 negotiation during which no resolution was decided upon, neither the plaintiff nor the individual defendants had specific involvement in the subsequent negotiations. Mr. Karpowich and Mr. Eagan, who handled these subsequent negotiations

worked together regarding the appointment of arbitrators, essentially working toward fulfilling the request for arbitration make by the plaintiff. It is for these reasons that the court finds that the plaintiff has failed to establish causation to support his claim for First Amendment retaliation.

### D. Whether Individual Defendants are Entitled to Qualified Immunity

As to qualified immunity, the Supreme Court has stated that it is meant to give government officials some "breathing room" when making reasonable, but mistaken, judgment calls regarding open legal questions. Lane v. Franks, 134 S. Ct. 2369, 2381 (2014). The Supreme Court has laid out a two-part test:

> First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct. Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right.
> Pearson v. Callahan, 129 S.Ct. 808, 815 (2009).

The court may now consider the second element of this test prior to the first element. Saucier v. Katz, 533 U.S. 194 (2001). The United States Supreme Court also stated that :

> [a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question ***beyond***

*debate*.
Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2083 (2011).

The issue of qualified immunity in this case turns on the "clearly established" language in the Pearson test. 129 S.Ct. 808, 815 (2009). It is clear to the court that it was not clearly established in 2011 that the plaintiff attempting to negotiate the terms of his own employment would be covered under First Amendment collective bargaining protections. Even if it was, it is unlikely that a "reasonable person would have known" of this right. As such, this court finds that qualified immunity applies to this case.

## VI. CONCLUSION

For the reasons discussed above, the defendants' motion for summary judgment is **GRANTED**. An appropriate order shall follow.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Date: July 2, 2015**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2013 MEMORANDA\13-2634-02.wpd